# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUDITH SCRUGGS, ADMINISTRATRIX | : | |
| OF THE ESTATE OF J. DANIEL | : | |
| SCRUGGS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:03-CV-2224 (PCD) |
| | : | |
| MERIDEN BOARD OF EDUCATION, | : | |
| ELIZABETH RUOCCO, MARY | : | |
| BETH IACOBELLI, and DONNA MULE, | : | |
| Defendants. | : | |

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Judith Scruggs brings this action on behalf of her deceased son, J. Daniel

Scruggs ("J.D."), alleging violations of 42 U.S.C. § 1983 for deprivations of Daniel's rights

under federal and state law and the Fourteenth Amendment of the United States Constitution,

conspiracy to deprive J.D. of due process and equal protection under 42 U.S.C. § 1985 and

common law, failure to prevent a violation of J.D.'s constitutional rights under 42 U.S.C. § 1986,

violations of the Rehabilitation Act, 29 U.S.C. § 794, and the American with Disabilities Act, 42

U.S.C. §§ 12101 et seq., and alleging a common law negligence claim under state law.

Defendants move for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons

explained below, Defendants' Motion for Summary Judgment [Doc. No. 74] is **granted in part**

and **denied in part.**

## I.      BACKGROUND

This action stems from Daniel's experiences enrolled at as a student at the Washington

Middle School ("WMS"), a public school in Meriden, Connecticut in the months leading to his

tragic suicide in January, 2002. (Compl. ¶¶ 8, 44.) The pertinent facts, either undisputed or,

where disputed, taken most favorably to Plaintiff, are as follows. Defendant Meriden Board of Education ("Board") maintains and operates WMS pursuant to Chapter 170 of Connecticut General Statutes. (Id. ¶ 4.) The Board operates and maintains the school in compliance with Connecticut General Statutes §§ 10-240 et seq. and receives funds from both the state and federal governments. (Id. ¶¶ 4, 13-14.) Defendant Elizabeth Ruocco ("Ruocco"), at all relevant times, was employed by the Board as Superintendent of Schools for Meriden. (Id. ¶ 5.) Defendants Mary Beth Iacobelli ("Iacobelli") and Donna Mule ("Mule") were also employed by the Board as Vice Principal and Guidance Counselor at WMS, respectively, at all relevant times. (Id. ¶¶ 6-7.)

When Daniel was in second grade, Daniel was diagnosed with a learning disability. (Defs.' Local R. 56(a)(1) Statement ¶ 2.) He was identified as an individual with a disability under 29 U.S.C. § 705(20), as a qualified individual with a disability under 42 U.S.C. § 12131, and as a child with an identifiable learning disability and/or a neurological impairment as defined by Connecticut General Statutes § 10-76a and Regulations of Connecticut State Agencies § 10-761-2. (Compl. ¶¶ 10-12.) As a learning disabled student, Daniel was entitled under the IDEA to a "free and appropriate public education," which includes an individualized education program ("IEP"), a written statement developed in a meeting of school personnel, parents, and, when appropriate, the student, for each child with a disability. See 20 U.S.C. § 1414. IEP addresses the student's present level of performance, the student's annual goals and instructional objectives, the educational services to be provided to the student and the method for evaluating whether the instructional objectives are met. Id. § 1414(d)(1)(A). Each IEP is developed by a team which consists of the parents of the child, at least one regular education teacher, at least one special education teacher, and a member of the local educational agency. Id. § 1414(d)(1)(B). In

March, 1997, the Planning and Placement Team ("PPT") at Daniel's school developed an IEP that provided him with special education instruction for 2.5 hours per week to improve his reading and written language skills. (Defs.' Local R. 56(a)(1) Statement ¶ 2.) Daniel's PPT conducted annual reviews of his IEP in April of 1998, 1999, and 2000, in accordance with 34 C.F.R. § 300.324. (Id. ¶¶ 3-6; Pl.'s Local R. 56(a)(2) Statement ¶ 3.)

In the course of the annual review conducted in April, 2000, the PPT noted that Daniel was performing at or above grade level in all areas except written responses, and it determined that Daniel was no longer eligible for special education services. (Defs.' Local R. 56(a)(1) Statement ¶¶ 6-7.) According to Plaintiff's expert, James Marchand, Ph.D., the PPT decided to exit Daniel from special education without current evaluation data, even though Daniel still demonstrated weaknesses and difficulties in learning. (Pl.'s Local R. 56(a)(2) Statement ¶ B.1.) The PPT decided instead that Daniel should be afforded modifications in his educational program pursuant to a Rehabilitation Act § 504 plan. (Defs.' Local R. 56(a)(1) Statement ¶ 7.) Daniel's eligibility for § 504 services was based on the PPT's determination that he had Attention Deficit Hyperactivity Disorder ("ADHD"), a conclusion that was never medically verified by a formal diagnosis. (Id. ¶ 8.) Defendants maintain that Plaintiff agreed with the PPT's decision. (Id. ¶ 7.) Plaintiff, however, disputes this fact, claiming she was not provided with written prior notice of the discontinuation of Daniel's special education service, did not participate in the April 2000 review, was not provided notice of a § 504 meeting, and was not afforded any of her other procedural rights associated with a § 504 meeting. (Pl.'s Local R. 56(a)(2) Statement ¶ 7, B.36; Ex. 3.) The parties also dispute the extent of Plaintiff's involvement in Daniel's various PPT and § 504 meetings. Defendants contend that Plaintiff

participated in all PPT and § 504 meetings (Defs.' Local R. 56(a)(1) Statement ¶ 9), while

Plaintiff asserts that she attended only one of each. (Pl.'s Local R. 56(a)(2) Statement ¶ 9, Ex. 3.)

Plaintiff's claims in this action arise in part from her allegations that Daniel was subject

to "constant" bullying and harassment by his classmates during sixth and seventh grade. (Pl.'s

Local R. 56(a)(2) Statement ¶ B.6; Ex. 9, Testimony of Melissa Lynn Smith ("Smith

Testimony") at 458-9.) A classmate of Daniel's testified that other students routinely pushed

Daniel around, knocked him off bleachers, yelled at him, and spit on his chair, (Pl.'s Local R.

56(a)(2) Statement ¶¶ B.5-6; Ex. 9, Smith Testimony at 455-58), and the record cites numerous

altercations between Daniel and other students. In November, 2000, Plaintiff observed a student

throw a chair at Daniel. The student was referred to the principal's office for discipline and

received a 5-day suspension. (Defs.' Local R. 56(a)(1) Statement ¶ 17.) Another incident

occurred between Daniel and another student on February 28, 2001, which resulted in one-day

suspensions for both students. (Id. ¶ 18.) One April 21, 2001, Daniel and another student had an

argument, the details of which are disputed by the parties and were recorded differently by the

students and teachers who filled out Individual Student Discipline Reports. (See Pl.'s Local R.

56(a)(2) Statement ¶ 19; Ex. 1.) According to Plaintiff, Daniel was struck in the face by a

student, choked, thrown down a flight of stairs, and stomped on by two students. (Id.) A gym

teacher at WMS, Thomas Michael Fitzgibbons, testified that on one occasion in June, 2001, he

saw a student pick Daniel up during gym class, put him on his shoulders, and spin him around.

(Pl.'s Local R. 56(a)(2) Statement ¶¶ 9-10; Ex. 10, Testimony of Thomas Michael Fitzgibbons

("Fitzgibbons Testimony") at 475-79.) Although Fitzgibbons referred the bullying student to the

disciplinary office at school, his report is not included in the WMS records.  (Pl.'s Local R. 56(a)(2) Statement ¶¶ 10-11; Fitzgibbons Testimony at 475.)

Plaintiff also alleges an incident between Daniel and J.W., a student who had pushed Plaintiff when she attempted to discipline him in January, 2001, when she worked at the school. (Defs.' Local R. 56(a)(1) Statement ¶ 28.)  When Plaintiff learned that J.W. and Daniel were placed in the same seventh grade class in September, 2001, Plaintiff complained to Daniel's teachers and school administrators out of concern that J.W. would bully or harass Daniel.  (Pl.'s Local R. 56(a)(2) Statement ¶¶ 44, 45.)  According to Plaintiff, Iacobelli and Mule refused her requests to separate Daniel and J.W., citing too much paperwork to do so.  (Id. ¶¶ 46, 47.) During the first month of seventh grade, Scruggs learned that J.W. had shoved desks into Daniel, pulled Daniel's hair, punched him and called him names in front of the class.  (Scruggs Dep. at 356-57.)  Meanwhile, other incidents continued to occur with other students, and Daniel was referred to the principal's office on October 18, 2001, in connection with being bullied by J.W. (Id. at 52-57, 358-59.) On November 5, 2001, Daniel was involved in a shoving incident with another student that ended in his being pushed into a desk, and both Daniel and the other student received office detentions.  (Defs.' Local R. 56(a)(1) Statement ¶ 55.)  At no time during Daniel's enrollment at WMS did he or his mother complain to the School Resource Officer about Daniel's being bullied (id. ¶ 56), though Plaintiff testified at her deposition that she initiated multiple meetings with Iacobelli and Mule to address Daniel's being bullied at school and relayed her concerns about this bullying to Iacobelli and Mule on several occasions in the fall of 2001.  (See Pl.'s Local R. 56(a)(2) ¶¶ B.22, 25, 30; Scruggs Dep. at 157, 357, 366-68, 384-85, 484-85.)

The record shows that Daniel exhibited several signs of emotional and academic trouble during sixth grade, which he entered in September of 2000. The record also shows that Defendants took numerous affirmative steps to address Daniel's issues, though the extent and appropriateness of those steps remains in dispute. Beginning in October, 2000, Daniel's teachers prepared weekly reports of his progress and sent them to Plaintiff. (Defs.' Local R. 56(a)(1) Statement ¶ 14.) Plaintiff received written notification of Daniel's excessive absences by correspondence dated January 8 and February 23, 2001, and Plaintiff informed school personnel that he was not coming to school because he was sick. (Id. 21.) During the second half of sixth grade, Daniel presented significant problems with hygiene, including an odor that suggested he had been incontinent of feces, and Defendant Mule had regular contact with Daniel to try to counsel him as to hygiene. (Id. ¶ 22.) Defendants maintain that this issue complicated Daniel's social problems with his peers and interfered with his education plan. (Id.) Over the course of sixth grade, Daniel had 20 authorized absences for illness or other reasons and 19 unauthorized absences, six of which were during the first two weeks of school. (Id. ¶ 15, 20.) On March 23, 2001, Mule and the school social worker met with Plaintiff to discuss Daniel's problems with attendance and hygiene. At this meeting, they suggested that Daniel needed psychological counseling and provided Plaintiff with a list of community resources, but Plaintiff did not agree with this recommendation. (Id. ¶ 23.) Defendants contend that Plaintiff also did not follow up with the recommended medical evaluations of Defendant's incontinence problems (id.), though Plaintiff denies this allegation. (Pl.'s Local R. 56(a)(2) Statement ¶ 23.) Around the same time, at the suggestion of his music teacher, Daniel participated in a school play, which by all accounts

6

was a positive experience for Daniel during which his attendance improved. (Defs.' Local R. 56(a)(1) Statement ¶ 24.)

On March 27, 2001, Daniel's PPT conducted a review of his § 504 plan. Plaintiff attended this meeting and agreed to all of the accommodations for Daniel that the team recommended, including counseling, preferential seating, and a mentor. The record of this meeting does not reflect that Plaintiff or any other member of the team raised any issues relating to Daniel's being teased, picked on, or bullied (Defs.' Local R. 56(a)(1) Statement ¶ 26), though Plaintiff testified that she did mention the bullying issue at that meeting. (Scruggs Dep. at 334.) Plaintiff received a copy of Daniel's § 504 Plan after the March 27, 2001 review meeting. (Defs.' Local R. 56(a)(1) Statement ¶ 27.)

Daniel's problems continued to worsen at the start of seventh grade in September, 2001. On September 21, 2001, three weeks after the start of school, Plaintiff met with Defendants Iacobelli, the vice-principal, and Mule, the school guidance counselor, both of whom expressed concerns relating to Daniel's hygiene, recommended that Daniel receive counseling, and provided Plaintiff with information on available resources. (Defs.' Local R. 56(a)(1) Statement ¶ 32.) Plaintiff, however, did not follow this advice, and at no point during Daniel's time as a student at WMS did Plaintiff obtain medical evaluation, treatment, or counseling for Daniel (id. ¶ 33), though Plaintiff contends that she attempted contacting a particular social worker at the Child Guidance Clinic on several occasions in the fall of 2001. (Id. ¶ 49; Pl.'s Local R. 56(a)(2) Statement ¶ 49.) On or about September 26, 2001, Mule requested Plaintiff's permission to refer Daniel to the Student Assistance Team ("SAT") to address attendance, hygiene, and anger management issues. (Id. ¶ 34.) On September 28, 2001, Plaintiff met again with Iacobelli and

Mule to discuss Daniel's issues and was told that a State of Connecticut, Department of Children and Families Family ("DCF") with Service Needs petition ("FWSN petition") would be filed by the school in an effort to gain DCF assistance in Daniel's case. (Id. ¶ 37.) On the same day, Plaintiff received written notification of Daniel's excessive absenteeism; this time, Plaintiff had been under the impression that Daniel was in school every day except for when he was ill. (Id. ¶ 36.) In October, 2001, Mule completed a FWSN petition in the presence of Plaintiff, citing Daniel's hygiene, temper, and attendance problems. (Id. ¶ 38.) The FWSN petition included no mention of Daniel's being bullied, though Plaintiff attests that Mule was well aware of the bullying at that time. (Id.; Pl.'s Local R. 56(a)(2) Statement ¶ 38.) On October 15, 2001, Plaintiff was again given a list of counselors recommended for Daniel, and Daniel was referred to a Meriden Public Schools truant officer. (Defs.' Local R. 56(a)(1) Statement ¶¶ 39, 40.) When they met with the truant officer, neither Daniel nor Plaintiff said anything about why Daniel was not going to school, and neither mentioned any incidents of bullying. (Id. ¶ 41.)

On or about October 18, 2001, the SAT met to discuss Daniel's issues. The SAT recommended that Daniel be transferred to WMS's School Within a School program ("SWAS"), a small, self-contained non-special education classroom for students experiencing difficulties in the larger middle school environment. (Defs.' Local R. 56(a)(1) Statement ¶ 42.) According to Plaintiff, Iacobelli told her that the school was transferring Daniel to SWAS because his life had been threatened and they feared for his safety. (Pl.'s Local R. 56(a)(2) Statement ¶ B.28; Scruggs Dep. at 520-21.) Plaintiff did not immediately agree to this placement because Daniel did not want to go to SWAS. (Defs.' Local R. 56(a)(1) Statement ¶ 43.) The SAT also recommended

beginning the PPT process that would include a psychiatric evaluation, among other assessments, to determine Daniel's eligibility for special education services. (Id. ¶ 51.)

On October 26, 2001, Mule filed a Report of Suspected Child Abuse/Neglect with DCF, identifying Daniel's poor hygiene and attendance problems as major areas of concern. (Defs.' Local R. 56(a)(1) Statement ¶ 53.) Plaintiff first met the DCF worker assigned to Daniel's case at school during school hours, but a home visit was not completed until December 3, 2001 because, according to Plaintiff, DCF workers failed to show up at an earlier scheduled home visit. (Id. ¶ 54; Pl.'s Local R. 56(a)(2) Statement ¶ 54.) Daniel stopped attending school on November 29, 2001. According to Plaintiff's testimony, the DCF worker told her that DCF wanted to place Daniel at the Wheeler Clinic and that he should not go back to WMS until the placement was complete. The DCF worker and the probation officer assigned to Daniel's truancy referral both claim, however, that they never told Plaintiff that she should not send Daniel to school. (Defs.' Local R. 56(a)(1) Statement ¶ 57.) By correspondence dated December 13, 2001, DCF notified Mule that, after an investigation prompted by her October complaint, no further DCF intervention would be provided. (Id. ¶ 58.)

On December 4, 2001, Daniel's PPT met and recommended that Daniel be tested and evaluated for special education services, including intellectual and visual motor functioning, social-emotional status, adaptive school behavior, and psychiatric evaluation. Plaintiff, who attending this PPT meeting, consented to these evaluations, and she reported to the team that Daniel had been involved in physical altercations with other students. (Defs.' Local R. 56(a)(1) Statement ¶ 59; Pl.'s Local R. 56(a)(2) Statement ¶ B.30, Ex. 2.) According to Mule's record of the December 4th PPT, Iacobelli reported that her investigation into the bullying incidents

reported by Plaintiff had led her to conclude that Daniel initiated many of the incidents with his passive-aggressive behavior (id. ¶ B.31, Ex. 2), though Iacobelli has denied having made statements at the December 4th PPT regarding an 'investigation.' (Id. ¶ 32; Iaocbelli Dep. at 40-43.) The PPT had 45 days to complete Daniel's evaluation and begin services. Defendants claim that the evaluation was not completed because Daniel never returned to school. (Id. ¶ 60.) Although Plaintiff's expert, Dr. Marchand, testified that out-of-school testing is not the norm (Marchand Dep. at 130), there is no requirement that evaluations be conducted at school. See 34 C.F.R. § 300.515. On January 2, 2002, Daniel committed suicide. (Compl. ¶ 44.)

Plaintiff filed the Complaint in this action on December 22, 2003, alleging violations of 42 U.S.C. § 1983 for deprivations of her son's rights under federal and state law and the Fourteenth Amendment of the United States Constitution, conspiracy to deprive Daniel of due process and equal protection under 42 U.S.C. § 1985 and common law, failure to prevent a violation of Daniel's constitutional rights under 42 U.S.C. § 1986, violations of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101 et seq., and common law negligence. On February 2, 2005, Defendants filed a Motion for Judgment on the Pleadings [Doc. No. 50] on all five counts of the Complaint. The Court issued a ruling [Doc. No. 58] on August 26, 2005, granting Defendants' Motion for Judgment on Count Four to the extent that Plaintiff seeks punitive damages under the Rehabilitation Act and the ADA, granting judgment on Count Four to Defendants Ruocco, Iacobelli, and Mule in their individual capacities, and denying the motion for the remainder of the claims. The Defendants subsequently filed a Motion for Reconsideration, which the Court granted, vacating in part its prior ruling and granting judgment on the pleadings for the Defendants on Plaintiff's equal

protection claim. [Doc. No. 88.]  Meanwhile, Defendants moved for summary judgment [Doc. No. 74] on all five counts of Plaintiff's complaint.  Plaintiff's remaining claims will be reviewed in turn below.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587(1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, (1986).  Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." Delaware & H.R. Co. v.Conrail, 902 F.2d 174, 178 (2d Cir. 1990).

The initial burden falls on the moving party, who is required to "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on the plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-

24 (2d Cir. 1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").  If the moving party meets its burden, the burden shifts to the party opposing summary judgment to set forth "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  In determining whether the parties have met their respective burdens, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citations omitted).  However, the non-moving party "may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that 'its version of the events is not wholly fanciful.'" Morris v. Lindau, 196 F.3d 102, 109 (2d Cir. 1999) (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)); see also FED. R. CIV. P. 56(e).  Determinations of the proper weight to accord evidence and assessments of the credibility of witnesses are within the sole province of the jury and are therefore improper on a motion for summary judgment.  Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996).  "If reasonable minds could differ as to the import of the evidence . . . and if . . . there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment." R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal citations omitted); see also Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

## III.    DISCUSSION

### A.    Subject Matter Jurisdiction

Defendants move for summary judgment on the ground that, because Plaintiff failed to exhaust her administrative remedies, the Court lacks subject matter jurisdiction. Administrative exhaustion is generally a prerequisite to filing an action in federal court for claims brought under § 1983 and the Rehabilitation Act and pursuant to the Due Process Clause of the Fourteenth Amendment, W.G. v. Senatore, 18 F.3d 60, 62 (2d Cir. 1994), and the IDEA requires parents and students to exhaust administrative remedies prior to a commencement of a civil action. See 20 U.S.C. § 1415(1). All of Plaintiff Scruggs's claims are subject to the IDEA exhaustion requirement because each claim seeks relief that is available under the IDEA. Hope v. Cortines, 69 F.3d 687, 688 (2d Cir. 1995). "Failure to exhaust administrative remedies permits a court to dismiss the action because no subject matter jurisdiction exists." DiLaura v. Power Auth. of N.Y., 982 F.2d 73, 79 (2d Cir. 1992). See also Polera v. Bd. of Educ. of Newburgh, 288 F.3d 478, 486 (2d Cir. 2002); Doe ex rel. Doe v. West Hartford Bd. of Educ., No. Civ. A. 3:99-CV-765 (DJSTPS), 2000 WL 557861, at * 3 (D. Conn. April 3, 2000). However, exhaustion is not required where the administrative remedies would be futile or inadequate to protect plaintiff's rights. Honig v. Doe, 484 U.S. 305, 326-27 (1988). Defendant argued in its Motion for Judgment on the Pleadings that exhaustion was required in  this case, an argument the Court rejected in its ruling dated August 26, 2005. See Scruggs v. Meriden Bd. of Educ., No. 3:03-CV-2224 (PCD), 2005 WL 2072312, at *3-4 (D. Conn. Aug. 26, 2005). There is no reason for Defendants' argument to succeed at this stage in the litigation either. It is undisputed that Daniel died on January 2, 2002, less than one month after the December 4, 2001 PPT. Plaintiff's pursuit

of an administrative hearing following Daniel's death would have been futile because no hearing officer would have been able to offer her adequate relief.  See J.S. ex. rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 113-14 (2d Cir. 2004).  Defendants' motion for summary judgment for lack of subject matter jurisdiction is therefore denied.

### B.    Federal Statutory and Constitutional Claims

Plaintiff Scruggs brings several federal statutory and constitutional claims under 42 U.S.C. § 1983 on Daniel's behalf.  Under 42 U.S.C. § 1983, an individual may bring a claim for damages against another who, acting under the color of state law, deprived him of a federal right. Richardson v. McKnight, 521 U.S. 399, 403 (1997).  Thus, "to prevail on a section 1983 claim, a plaintiff must prove that the challenged conduct was attributable at least in part to a person acting under color of state law, and that the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States."  Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 136-37 (2d Cir. 1999) (citing Dwares v. City of New York, 985 F.2d 94, 98 (2d Cir. 1983)).  Scruggs alleges that Defendants deprived Daniel of his rights under the IDEA, Section 504 of the Rehabilitation Act, the ADA, and the Fourteenth Amendment, and Defendants now move for summary judgment on all of Plaintiff's Section 1983 claims. Specifically, Defendants argue that Plaintiff's IDEA, Section 504, and ADA claims must fail because she has failed to provide expert testimony supporting findings by the trier of fact as to the requisite elements of these claims.  Defendants maintain that Plaintiff's IDEA claim must fail because there is no basis in the record for finding that Defendants' conduct denied Daniel a FAPE.  Defendants also contend that Plaintiff's Section 504 claim must fail because, in addition to the failure to show a denial of a FAPE, Plaintiff has failed to produce evidence showing the

requisite finding of bad faith or gross misjudgment.  Finally, Defendants argue that, even if

Plaintiff shows that Daniel had a disability for purposes of Section 504 and the ADA, there is no

evidence that he was denied education benefits because of this disability.

### 1.     *Timeliness of § 1983 Claims*

The Court first addresses Defendants' contention that Plaintiff's claims based on events

that occurred prior to December 2000 are barred by Connecticut's statute of limitations.  Section

1983 has no statute of limitations of its own, so it borrows the general or residual statute of

limitations for personal injury actions of the state in question.  See Owens v. Okure, 488 U.S.

235, 245-50 (1989); Lounsbury v. Jeffries, 25 F.3d 131, 133 (2d Cir. 1994).  In Connecticut, the

applicable statute is Connecticut General Statute § 52-577, which provides that no action

founded upon a tort shall be brought "but within three years from the date of the act or omission

complained of."  Plaintiff commenced this action in December 2003.  Defendants argue that to

the extent Plaintiff's claims relate to Daniel's exit from special education in April 2000 and the

lack of a triennial evaluation preceding that determination in March 2000, these claims are

untimely.  Defendants also contend the claims relating to the April 2000 events are not viable

because the present Defendants were not involved in those events.  Plaintiff counters that the

Complaint alleges a continuing course of conduct continuing through December 2001 and that,

accordingly, her suit filed in December 2003 fell within the statute of limitations.

The continuing course of conduct doctrine allows a plaintiff to file suit at a later date if

"the last act alleged to be part of the ongoing pattern of discrimination occurs within the filing

period...."  Velez v. City of New London, 903 F. Supp. 286, 290 (D. Conn. 1995) (internal

citations omitted); see also Sherwood v. Danbury Hosp., 252 Conn. 193, 202-03 (2000).  The

question of whether a party engaged in a continuing course of conduct that tolled the running of the statute of limitations is a mixed question of law and fact. Giulietti v. Giulietti, 65 Conn. App. 813, 833, cert. denied, 258 Conn. 946 (2001); Starkweather v. Patel, 34 Conn. App. 395, 401, cert. denied, 230 Conn. 905 (1994). "[A] precondition for the operation of the continuing course of conduct doctrine is that the defendant must have committed an initial wrong upon the plaintiff." Sherwood, 252 Conn. at 204. Plaintiff must also bring evidence of the breach of a duty "that remained in existence after commission of the original wrong related thereto," Giulietti, 65 Conn. App. at 834; such "continuing wrongful conduct may include acts of omission as well as affirmative acts of misconduct...." Id. at 835 (internal citations omitted). A continuing violation, however, is "occasioned by continuing unlawful acts, not by continued ill effects from the original violation." Chambers v. Waterbury Police Dep't, No. Civ. 3:02-CV-2050 (AWT), 2003 WL 1986932, at *2 (D. Conn. April 17, 2003) (quoting Doe v. Blake, 809 F. Supp. 1020, 1025 (D. Conn. 1992)).

As this Court has noted in a prior ruling in this action, see Scruggs v. Meriden, 2005 WL 2072312, at * 5 (D. Conn. Aug. 26, 2005), most Connecticut case law regarding the continuing course of conduct doctrine deals with medical malpractice, legal malpractice, or situations in which there are continuing misrepresentations, such as, for example, cases regarding product liability or product safety. See, e.g., Giglio v. Conn. Light & Power, 180 Conn. 230, 429 A.2d 486 (1990). No Connecticut court has addressed whether or not a school administration and education staff's failure to conform to the applicable federal and state special education statutes can constitute a continuing course of conduct, and this Court will defer to the state courts to resolve that question of state law. In this particular case, however, genuine issues of material fact

exist as to whether Plaintiff has satisfied both prongs of the continuing course of conduct test. As will be discussed below (see infra Section III.B.2), Defendants have failed to eliminate the existence of genuine issue of material fact concerning the propriety of their actions taken in April 2000 to protect Daniel's federal rights. Defendants have also failed to eliminate the existence of genuine issue of material fact concerning their adequately addressing the ongoing bullying and harassment of a learning disabled child. Given the genuine issue of fact regarding the ongoing treatment of Daniel by Defendants from the period of April 2000 until his death in December 2001, the Court finds that Plaintiff has sufficiently alleged a continuing course of conduct. Accordingly, Plaintiff's claims, filed in 2003, well within three years of Daniel's December 2001 death, are timely, and summary judgment is not appropriate on this basis.

### 2. *Denial of a Free and Appropriate Public Education*

The IDEA ensures that all children with disabilities have access to a free appropriate public education (FAPE) designed to meet their unique needs, and it protects the rights of children with disabilities and their parents to receive a FAPE. 20 U.S.C. §§ 1400 et seq.; 34 C.F.R. § 300.1; see also T.L. v. New Britain Bd. of Educ., 394 F. Supp. 2d 522, 531 (D. Conn. 2005). "What constitutes a free appropriate public education is determined on a case-by-case basis, pursuant to procedures established by the IDEA." Id. (citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 488 U.S. 176, 181-82 (1982)). Section 504 of the Rehabilitation Act also requires recipients of federal funds to provide disabled students with a FAPE. See 29 U.S.C. § 701(c); 34 C.F.R. § 104.33(a). Under Section 504, an appropriate education is defined as "the provision of regular or special education and related aids and services that... are designed to meet individual educational needs of handicapped persons as

adequately as the needs of non-handicapped persons are met...." 34 C.F.R. § 104.33(b). Plaintiff claims Defendants deprived Daniel of a FAPE by improperly exiting him from special education, failing to refer him to a PPT when he was in sixth grade, failing to undertake the required and necessary evaluation and assessment to determine his emotional and academic needs, failing to conduct the required triennial evaluation, and failing to develop and implement an appropriate individual education plan (IEP). (Compl. ¶ 45a-e.) Defendants contend that no genuine issue of material fact exists regarding Plaintiff's alleged denial of her and her son's procedural and substantive rights to a FAPE.

Questions of fact preclude a finding of summary judgment in favor of Defendants on the issue of the FAPE denial. There is no dispute that the members of the April 6, 2000 PPT determined that Daniel was no longer eligible for special education and discontinued services. However, a question of fact exists as to whether such a determination improperly denied him a FAPE. Plaintiff proffers that Defendants did not conduct any standardized tests or complete any formal evaluations of Daniel that had been validated for the specific purpose of evaluating his eligibility for special education. As Plaintiff asserts, no evidence exists in the record that tests or evaluations were conducted by properly trained school personnel as required by 34 C.F.R. § 300.321, that any test procedures used to evaluate Daniel were specifically tailored to his needs as required by § 300.324, or that Defendants conducted a comprehensive assessment of Daniel's disability through procedures contemplated by the IDEA, see id., §§ 300.301 - 300.306, or by state law. See R.C.S.A. § 10-76D-9(b). For example, Defendants state that they suspected that Daniel had an ADHD condition but that it was never verified. (Defs.' Mem. for Summ. J. at 11; see also Pl.'s Opp., Ex. 3.) However, Defendants were generally required to evaluate all areas of

Daniel's suspected disability, 34 C.F.R. §§ 300.320 - 300.324, and IDEA regulations required

Defendants to further evaluate Daniels' needs and conduct any necessary medical examination

once an initial evaluation indicated a possible ADHD condition.  Id.; 34 C.F.R. §§ 300.304 -

300.305.  Defendants also fail to provide definite evidence to rebut Plaintiff's claims that

Defendants failed to conduct a triennial evaluation of Daniel or failed to sufficiently develop and

implement an IEP for Daniel.  There is also a dispute in the record as to whether, based on any

evaluation of Daniel that was performed by Defendants, Daniel had a disability that continued to

qualify him for IDEA.  Defendants maintain that Daniel no longer had any problem with his

skills and that he was performing at or above grade level in all areas except written response.

(Defs.' Mem. for Summ. J. at 12.)  Plaintiff contends that the learning disabilities teacher's

performance report dated April 6, 2000, shows problems with Daniel's skills.  (Pl.'s Local R.

56(a)(2) Statement ¶ B.36, Ex. 3.)  Plaintiff also argues that in the absence of any comprehensive

current data from standardized testing of Daniel's ability, the opposite of Defendants' conclusion

may be inferred.  (See id.)  See also 34 C.F.R. § 300.324.

A question also remains as to whether the April 6, 2000 PPT was overdue in violation of

federal law.  In response to Plaintiff's claim that Defendants failed to refer Daniel to a PPT

during sixth grade in violation of federal law, Defendants point to the fact that Plaintiff was

entitled to request a PPT but had failed to do so.  Implicating Plaintiff's behavior in this instance

does not, however, resolve the question as to whether Defendants failed to meet their IDEA

obligations.  Defendants put forth a more reasonable argument that ongoing interventions in

Daniel's PPT by school personnel, evidenced in the record, complied with the IDEA mandate

that students be educated in the least restrictive environment appropriate.  20 U.S.C. §

1412(a)(5)(A).  Proof that Defendants' actions aimed to fulfill this aspect of the IDEA mandate, however, still does not decide as a matter of law that Defendants' educational plan was appropriate for Daniel's needs.

To the extent Defendants did place Daniel on a Section 504 Plan following the April 6, 2000 PPT meeting and to the extent they followed the March 27, 2001 Section 504 Plan, there remains a dispute as to whether these plans were not appropriate for Daniel's needs and thus denied him of a FAPE.  All parties agree that Daniel had recognized academic difficulties, anger management issues, and emotional issues; the record does not show, however, that the 504 Plan was remedial.  On the contrary, after the plan was implemented, Defendant continued to report Daniel's numerous absences from school (Defs.' 56(a) Exs. B, H, K, M) and his repeated confrontations with other students.  (Id. Exs. E, N, P.)  With this information, which was sufficient for Defendants to conclude that its Section 504 Plans were inappropriate for Daniel's needs, Defendants were required to make a prompt referral to a PPT.  R.C.S.A. § 10-76d-7. Defendants did not refer Daniel to a PPT again until November 30, 2001 (Ex. Q), months after problems with Daniel's attendance and behavior had been reported.  Given all of these unresolved factual issues in the record, the Court is unable to grant summary judgment for Defendants on Plaintiff's claims of a substantive denial of a FAPE under the IDEA.

A question of fact also remains as to whether procedural irregularities occurred in the handling of Daniel's education, which may amount to a denial of FAPE.  A FAPE denial has occurred where procedural irregularities result in the loss of educational opportunity or seriously infringe upon the parent's opportunity to participate in the development or formulation of the IEP.  W.A. v. Pascarella, 153 F. Supp. 2d 144 (D. Conn. 2001).  See also Shapiro v. Paradise

Valley Unified Sch. Dist. No. 69, 317 F.3d 1072 (9th Cir. 2003).  Failure to conform with the procedural requirements of the IDEA or Section 504 rises to the level of a FAPE if the parent's opportunity to participate in the formulation of an IEP is significantly hampered in some way. Cerra v. Pawling Centr. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005).  Plaintiff contends that, at the time of the PPT, Defendants failed to implement a meaningful or current comprehensive assessment of Daniel's disability other than their Triennial Review, which Plaintiff alleges failed to conform to IDEA evaluation procedures.  (Pl.'s 56(a)(2) ¶ B. 36.)  See 34 C.F.R. §§ 300.500 - 300.504.  Plaintiff also contends that Defendants failed to comply with the prior notice requirements of the IDEA (Pl.'s 56(a)(2) ¶ B.36, Ex. 3), which provides that a school must send written notice to a parent when it proposes to initiate or change the identification, evaluation, educational placement, or provision of FAPE to a student prior to implementing that proposal. 34 C.F.R. § 300.503(a).  According to Plaintiff, Defendants should have but failed to provide her with a written prior notice of their proposed action to discontinue special education for Daniel, their reasons for doing so, their consideration of other options (or the reason for their failure to consider other options), a description of each evaluation supporting Defendants' decision, a description of other relevant factors supporting their decision, and other sources to assist the parent in understanding the written prior notice.  See 34 C.F.R. § 300.503(b).  In defense, Defendants refer to Plaintiff's participation in all team meetings concerning Daniel and her acknowledgment that she received notice of her procedural rights on each occasion.  (See Defs.' Reply at 4.)  However, the regulations specifically provide that a parent, to whom these issues may be unfamiliar, must receive notice of the issues *prior* to any team meeting so that she may be up to speed and prepared for the complex conversation regarding her child's well-being, and

responsibility for complying with the IDEA lies with the school, not with the parent. Unified Sch. Dist. v. Dep't. of Ed., 64 Conn. App. 273, 285 (2001). Plaintiff's conscientious involvement in her son's educational planning in this case does not absolve Defendants of their obligations to comply with the procedural requirements of the IDEA.

The record also suggests that Defendants violated Daniel's procedural rights to a FAPE by failing to refer him to special education until a year and a half after Daniel had exhibited problems at school. State law requires Defendants to refer a student to a PPT for an evaluation if there is evidence that his or her behavior, attendance, or progress in school is considered marginal or unsatisfactory. R.C.S.A. § 10-76d-7. The record shows that Defendants in this case had evidence that Daniel's attendance was unsatisfactory throughout the 2000-01 and 2001-02 school years. (Defs.' Mem. Exs. B, E, H, I, M.) Defendants had filed a complaint with the Connecticut Juvenile Court and the Department of Children and Families because of Daniel's excessive absences. (Id. Exs. C, D, G, N, P.) The Section 504 Plan dated March 27, 2001 noted poor completion of academic tasks, anger management issues, and emotional outbursts. (Id. Ex. F.) Despite this evidence, Defendants did not refer Daniel to special education until December 4, 2001 (id. Ex. Q), nearly a year and a half after Daniel's behavior and attendance problems became noticeable to Defendants, raising another genuine issue of material fact as to their denying Daniel a FAPE.

Read in the light most favorable to the nonmoving party, the record contains genuine issues of material fact as to whether Daniel was denied a FAPE in violation of the IDEA and Section 504. Accordingly, Defendants' motion for summary judgment on Count One of Plaintiff's complaint is denied.

22

### 3.    *Denial of Due Process*

Defendants also move for summary judgment on Plaintiff's due process claims.  Plaintiff claims that Daniel was deprived of his due process rights in violation of the Fourteenth Amendment as a result of Defendants' failure to protect, supervise, or terminate the harassment and bullying to which Daniel was allegedly subjected.  (Compl. ¶ 46a-c.)  Plaintiff also claims that Defendants encouraged, permitted, or acquiesced in the other students' harassing and bullying conduct, placed Daniel at risk, and failed to develop and implement anti-harassment and anti-bullying policies at Daniel's school, all in violation of Daniel's rights under the Fourteenth Amendment.  (Id. ¶ 46 d-g.)

A due process violation exists where governmental action has been arbitrary, conscience-shocking, or oppressive in a constitutional sense, not just incorrect or ill-advised.  Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994).  In general, the state has no affirmative duty to protect the life, liberty, or property of a citizen from deprivations by private actors.  DeShaney v. Winnebago City Soc. Servs. Dep't, 489 U.S. 189, 197-98 (1989); Crispim v. Athanson, 275 F. Supp. 2d 240, 245 (D. Conn. 2003) ("[T]he Due Process Clause of the Fourteenth Amendment does not burden the state with an affirmative duty to protect its citizens.").  A limited exception exists where the state "itself has created or increased the danger to the individual." Id. (citing Dwares v. City of New York, 985 F.2d 84, 98-99 (2d Cir. 1993)).  Courts have recognized Section 1983 liability based on the "state danger exception" where the state or its agents commit "affirmative acts using their authority to create an opportunity for harm to the plaintiff that would not otherwise have existed." Crispim, 275 F. Supp. 2d at 246 (citations omitted).  Plaintiff brings her claim pursuant to this "state danger exception."

Contrary to Defendants' contentions, the disputed facts in the record show that Daniel was repeatedly bullied at school, a situation of which Defendants were well aware, and raise a genuine issue as to the appropriateness of Defendants' response. The record shows that Daniel was subjected to "constant" bullying in sixth and seventh grade, including being pushed around, yelled at, spit upon, and knocked off the bleachers by other students. (Pl.'s Local R. 56(a)(2) ¶¶ B. 5-7; Ex. 9, Smith Testimony at 457-59.) The record also shows that Plaintiff and several teachers reported specific incidents of students' assaulting Daniel to the school administration, and one of these incidents resulted in a five-day suspension of the bullying student. (Pl.'s Local R. 56(a)(2) ¶¶ B. 9-10, 12-13, 15; Ex. 1, Individual Student Discipline Report; Ex. 10, Fitzgibbons Testimony at 475, 477-479; Scruggs Dep. at 151-52; Mule Dep. at 24-26.) Reports of these bullying incidents, however, did not end up in the records maintained by WMS. (Pl.'s Local R. 56(a)(2) ¶¶ B. 10, 11, 13.)

Scruggs's due process claim is specifically based on Daniel's placement in seventh grade in a group with J.W., a student who had assaulted Plaintiff the previous year. According to Scruggs's deposition testimony, she asked the school to separate the two students but Defendants Iacobelli and Mule refused, citing too much paperwork. (Ex. 11, Scruggs Dep. at 52-57, 358-59.) During the first month of seventh grade, in September 2001, Scruggs learned that J.W. had shoved desks into Daniel, pulled Daniel's hair, punched him and called him names in front of the class. (Id. at 356-57.) She brought this incident to the attention of Defendants Iacobelli and Mule, who, according to Plaintiff's testimony, stated that Daniel was bringing the bullying problem onto himself. (Id. at 366-68.) Following another assault on Daniel by another student and another meeting initiated by Scruggs with Iacobelli and Mule regarding Daniel's being

bullied at school (id. at 157, 384-85), Iacobelli informed Scruggs that Daniel was being transferred to the SWAS trailer because "they feared for his safety." (Id. at 417-19.) Another incident of J.W.'s bullying Daniel was reported in November, 2001. (Id. at 512.) The record thus contains sufficient evidence to substantiate Plaintiff's allegations of a "campaign" of bullying and harassment of Daniel and of Defendants' awareness of these repeated classroom assaults.

However, the record does not show that Defendants affirmatively placed Daniel in harm's way to the extent required of a substantive due process claim. Under the "state danger exception," Section 1983 liability is not implicated by a mere failure to act. Crispim, 275 F. Supp. 2d at 240 (citing Lamay v. Town of Bloomfield, 62 F. Supp. 2d 583, 588 (D. Conn. 1999)). "[T]he boundaries of the state created danger exception to DeShaney are not entirely clear," but the exception does require a government defendant to "either be a substantial cause of the danger... or at least enhance it in a material way." Clarke v. Sweeney, 312 F. Supp. 2d 277, 293 (D. Conn. 2004). See also Dwares, 985 F.2d at 99 (due process claim stated where defendants allegedly "conspired" with plaintiff's assailants and "aided and abetted" the deprivation of plaintiff's civil rights). Furthermore, in the context of school bullying and harassment, courts have held that schools have no duty under the due process clause to protect students from assaults by other students, "even where the school knew or should have known of the danger presented." Santucci v. Newark Valley Sch. Dist., No. 3:05-CV-0971, 2005 WL 2739104, at * 3 (N.D.N.Y. Oct. 24, 2005). See Graham v. Indep. Sch. Dist. No. I-89, 22 F.3d 991, 994 (10th Cir. 1994); Doe v. Hillsboro Indep. Sch. Dist., 113 F.3d 1412, 1415 (5th Cir. 1997); Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 911 (6th Cir. 1995); Dorothy J. v. Little

Rock Sch. Dist., 7 F.3d 729, 732 (8th Cir. 1993); D.R. by L.R.. v. Middle Bucks Area Vo. Tech. Sch., 972 F.2d 1364, 1368-73 (3d Cir. 1992) (en banc); J.O. v. Alton Cmty. Unit Sch. Dist. 11, 909 F.2d 267, 272 (7th Cir. 1990). See also Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655 (1995) ("[W]e do not, of course, suggest that public schools as a general manner have such a degree of control over children as to give rise to a constitutional 'duty to protect.'"). Although the record here clearly reflects that Daniel was subjected to repeated bullying and harassment by his classmates and that Defendants were made aware of this harassment, Defendants' mere failure to take steps to fully remedy the situation does not amount to an affirmative creation of danger to Daniel's well-being. Nothing in the record shows that Defendants encouraged students to bully or harass Daniel or "affirmatively permitted them to victimize" Daniel in any way. Clarke, 312 F. Supp. 2d at 290. Thus, the Court finds that the state created danger exception to DeShaney is inapplicable based on the undisputed facts of this case as well as the disputed facts considered in a light most favorable to the plaintiff.

Even assuming a state-created danger existed, Defendants' conduct did not "shock the conscience" as is necessary to give rise to a substantive due process violation. To shock the conscience, governmental conduct must be so extreme or outrageous that it can be viewed as "brutal" and "offensive to human dignity." Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246 (2d Cir. 2001). In retrospect, given the evidence presented and the subsequent tragic turn of events, the record reflects poorly on Defendants' decisions to relatively limit their response to the repeated bullying of Daniel by his classmates; nevertheless, Defendants' failure to fully remedy the bullying situation does not amount to "brutal" or "oppressive" treatment of Daniel at school. To be sure, Defendants did discipline some of the bullying perpetrators, and they did take steps to

try to ensure Daniel's well-being, including recommending his transfer to the SWAS program once they concluded that his safety was in danger. (See, e.g., Defs.' Local R. 56(a)(1) Statement ¶¶ 17, 18; Pl.'s Local R. 56(a)(2) Statement ¶ b>28; Scruggs Dep. at 520-21.) Although the efficacy of Defendants' conduct may be questioned, the level of their response to Daniel's being bullied was not so extreme or outrageous as to violate his substantive due process rights, given the strict standard of <u>DeShaney</u> and <u>Dwares</u>. See <u>Clarke</u>, 312 F. Supp. 2d at 293. It is also unclear that Defendants had reason to believe that because J.W. assaulted Plaintiff the prior year, he posed an immediate danger to Daniel. The fact that they did not switch Daniel out of J.W.'s class at the beginning of the grade 7 school year accordingly does not "shock the conscience" as Plaintiff would have it. For these reasons, no genuine issue of material fact exists as to Plaintiff's substantive due process claim, and summary judgment should be granted to Defendants on this claim.

### 4. *Failure to Train or Supervise*

Defendants move for summary judgment on Plaintiff's claim that "[t]he Defendant Board, its employees, agents, and/or servants failed and refused to train and supervise with respect to handling and caring for children with disabilities, establish procedures relating to the rights of disabled children and prevention of harassment, and to provide J. Daniel with proper educational support and a safe educational environment" in violation of his substantive due process rights. (Compl. ¶ 47.) Plaintiff has also alleged that the Defendants acted in bad faith, with reckless indifference to Daniel's rights, and with "deliberate indifference" to his rights and well-being. (Id. ¶¶ 48, 49.) Defendants contend that Plaintiff has offered no evidence regarding which teachers or administrators witnessed the alleged incidents of bullying and harassment.

27

Defendants also contend that Plaintiff has presented no evidence showing that the alleged bullying was so pervasive that the Board can be charged with notice of the bullying or that the need for training should have been obvious to the Board.

Defendants' argument is unavailing. As recounted above (see Section III.B.2, supra), the record contains numerous incidents of classmates' bullying and harassing Daniel, all of which are substantiated by teachers and/or discipline-related school reports submitted to school administrators. The record shows several instances where Scruggs complained to Iacobelli and Mule of Daniel's being bullied at school. During the state court trial, Mr. Fitzgibbons, a physical education teacher at WMS, testified that he reported to the school administrators a bullying incident that he witnessed, and one of Daniel's classmates testified that her classmates' bullying of Daniel was "constant." The only reasonable reading of the record leads the Court to conclude that Defendants were well aware of a series of harassing incidents perpetrated against Daniel by his classmates during the 2000-01 and 2001-02 school years.

The issue, however, is not whether Daniel was bullied or whether Defendants were aware of this bullying but whether the Defendant Board, acting with a deliberate indifference to Daniel's rights and well-being, failed to train or supervise school employees to address Daniel's special education needs or his being bullied by his classmates. "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). Of the several different ways to establish municipal liability under

Section 1983, municipal liability is triggered in this case by allegations of the Board's failure to train or supervise its employees in violations of Daniel's rights under federal law. "Failure to train subordinate municipal employees will trigger municipal liability 'only where the failure to train amounts to deliberate indifference to the rights' of members of the public with whom the employees will interact." Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006) (quoting City of Canton v. Harris, 489 U.S. 378, 388 (1989)). "Deliberate indifference" may be found where municipal employees, "in exercising their discretion, so often violate constitutional rights that the need for further training must have been plainly obvious to the city policymakers[.]" City of Canton, 489 U.S. at 390 n.10. "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995) (citations omitted).

The Second Circuit has established three requirements for showing that a lack of training manifests deliberate indifference. See Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992); see also Green, 465 F.3d at 80-81. First, the plaintiff must offer evidence from which a reasonable jury could conclude "that a policy-maker knows 'to a moral certainty' that her employees will confront a given situation." Id. at 297 (quoting City of Canton, 489 U.S. at 390 n.10). Second, "the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." Walker, 974 F.2d at 297. "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a

citizen's constitutional rights." Id. at 298. At the summary judgment stage, an additional requirement exists: a plaintiff must "identify a specific deficiency in the city's training program and establish that the deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." Amnesty Am. v. Town of Hartford, 361 F.3d 113, 129 (2d Cir. 2004). See also Jenkins v. City of New York, Doc. No. 06-0182-CV, 2007 WL 415171, at * 11 (2d Cir. Feb. 6, 2007)).

In its ruling on Defendants' motion for judgment on the pleadings, the Court concluded that Plaintiff Scruggs' allegations that Defendants' failure to effectively address Daniel's special education needs and the ongoing bullying situation support an inference that Defendants were deliberately indifferent to Daniel's rights. See Scruggs, 2005 WL 2072312, at * 8. In theory, a reasonable jury may find that Defendants did not comply with the IDEA beginning in March of 2000 and continuing to Daniel's death in January of 2002, and on that basis infer that, despite their knowledge of the harassment and bullying suffered by Daniel as a learning disabled child, Defendants failed to take the appropriate measures to deal with this ongoing situation. However, at this stage in the proceedings, Plaintiff has not made a sufficient showing that the Board failed to train or supervise its employees in anti-bullying or special education needs procedures with direct indifference to Daniel's rights. Defendant Iacobelli stated once in her deposition that she does not recall any meetings or workshops at WMS regarding bullying (Pl.'s Opp., Ex. 7 at 60); otherwise, Plaintiff proffers no evidence of a training deficiency or of Defendants' deliberate indifference to implementing appropriate policies. Plaintiff has not identified a specific deficiency in any Board of Education training program that accounts for Daniel's deprivation of a FAPE or his other rights under federal law. Although, read in the light most favorably to the

Plaintiff, the record provides evidence from which a reasonable jury may infer that there is a history of school teachers and administrators mishandling Daniel's special education needs, see Walker, 974 F.2d at 297, the record does not show that the Board's inadequate training of its employees is "closely related" to any injury to Daniel. "A training program is not inadequate merely because a few of its graduates deviate from what they were taught." Jenkins, 2007 WL 415171, at * 12.

To survive a summary judgment motion, Plaintiff must be able to show a specific deficiency in training, or, as the case may be, the complete absence of a city training program. The record is devoid of evidence or testimony regarding the training that WMS teachers and administrators did or not receive, the guidelines they may or may not have been instructed to follow by the Board, and the procedures that were or were not in place for handling children with special education needs who were being bullied by their classmates. Although there is evidence of Defendants' mishandling Daniel's case, there is no evidence that the Board should have been on notice that training and supervision of its employees should be better implemented. Plaintiff has presented no evidence regarding school administrators' mishandling similar situations in which students with special education needs were bullied or harassed by their classmates. See Russo v. City of Hartford, 341 F. Supp. 2d 85, 109-10 (D. Conn. 2004). "Since the existence of a policy of non-supervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question, a plaintiff cannot prevail on a § 1983 claim against a municipality without introducing other evidence." Id. at 110 (quoting Fiacco v. City of Rensselaer, 783 F.2d 319, 328 (2d Cir.1986)). Plaintiff has failed to raise any genuine issue of material fact as to the Defendant Board's failure

to train or supervise its employees, and Defendants are therefore entitled to summary judgment on Plaintiff's deliberate indifference claim.

### 5.    *Violations of the Rehabilitation Act and the ADA*

Defendants move for summary judgment on Plaintiff's claims that Defendants "contributed to and acquiesced in creating an abusive educational environment" and, in doing so, discriminated against Daniel on the basis of his disability in violation of the Rehabilitation Act, 29 U.S.C. § 794, and the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.  Because the protections and requirements of Section 504 of the Rehabilitation Act and Title II of the ADA are virtually identical, see Weixel v. Bd. of Educ. of City of New York, 287 F.3d 138, 146 n. 6 (2d Cir. 2002); Garcia v. S.U.N.Y. Health Sci. Ctr., 280 F.3d 98, 113 (2d Cir. 2001), the Court analyzes Plaintiff's claims under the two statutes together.  To establish a prima facie violation of Section 504 of the Rehabilitation Act or of Title II of the ADA, Plaintiff must demonstrate that Daniel was a "qualified individual[ ] with a disability" and that he was "denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or w[as] otherwise discriminated against by defendants, by reason of [his] disabilit[y]."  Mutts v. S. Conn. State Univ., No. Civ. 3:04-CV-1746 (MRK), 2006 WL 1806179, at *4 (D. Conn. June 24, 2006) (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003)).  As opposed to the IDEA, which is phrased in terms of a state's affirmative duty to provide a FAPE, Section 504 is worded as a negative prohibition against disability discrimination in federally funded programs.  B.L. v. New Britain Bd. of Educ., 394 F. Supp. 2d 522, 540 (D. Conn. 2005) (citing Smith v. Robinson, 468 U.S. 992, 1016 (1984)).  "Based on this distinction, courts have found that, in order to establish a Section 504 violation, a plaintiff must demonstrate bad faith or gross misjudgment in

addition to the denial of a [FAPE]." A.W. ex rel. Ms. C. v. Marlborough Co., Portland Health Care Inc., 25 F. Supp. 2d 27, 31-32 (D. Conn. 1998) (citing cases). Based on this distinction, violations of Section 504 or Title II of the ADA may be awarded only upon a showing of "deliberate indifference to the rights secured the disabled by the acts." Garcia, 280 F.3d at 115. See also Myslow v. New Milford Sch. Dist., No. Civ. 3:03-CV-496 (MRK), 2006 WL 473735, at *9 (D. Conn. Feb. 28, 2006). Similarly, "a private suit for money damages under Title II of the ADA may only be maintained against a state if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability[.]" Garcia, 280 F.3d at 112.

Defendants contend that there is no basis for a discrimination claim on the basis of a learning disability because Daniel received Section 504 services and accommodations due to a suspected condition of Attention Deficit Hyperactivity Disorder (ADHD), not due to a learning disability. (Defs.' Local R. 56(a) ¶ 7.) There is no dispute, however, that Daniel had been identified as having a learning disability when he was in second grade, and Plaintiff disputes the basis for Defendants' determination of Daniel's eligibility for Section 504 services. (Pl.'s Local R. 56(a)(2) ¶ 7, Ex. 3.) The Court therefore cannot conclude as a matter of law that Daniel did not have a disability on the basis of which he was discriminatorily treated. Defendants also contend that Plaintiff has not shown that Daniel was discriminated against because she did not show that he was denied a FAPE. However, as discussed above, fact issues preclude summary judgment on Plaintiff's claim of a denial of a FAPE, and, accordingly, the Court cannot conclude that a FAPE did not occur for purposes of judgment on Plaintiff's Section 504 and ADA claims.

The key question, however, is whether a genuine issue of material fact exists regarding Defendants' alleged discriminatory animus toward Daniel or their alleged deliberate indifference to his federal rights. The record is devoid of evidence that Defendants's alleged failure to provide Daniel with a FAPE was motivated by discriminatory animus. The record also does not show that Defendants' conduct rose to the level of "deliberate indifference" required to establish a discrimination claim under the ADA. Defendants did provide Daniel with some services to address his problems, and school personnel did constructively intervene at certain times to involve Daniel in a school play, assign him a mentor, refer him to DCF and to a truant officer, and ultimately refer him to the SWAS program and to a PPT. (Marchand Dep. at 115-29.) As Plaintiff's expert, Dr. James Marchand, testified, "the school board could have played a much more proactive role earlier" in dealing with Daniel's problems, which "needed addressing earlier on and in a much more aggressive and comprehensive way." (Id. at 147, 148). Such a failure on the part of the Defendants, however, does not amount to a showing of "deliberate indifference" where evidence shows that Defendants did make some efforts to improve and remedy Daniel's attendance, hygiene, and emotional issues. Accordingly, summary judgment is entered for Defendants on Plaintiff's Section 504 and ADA discrimination claims.

### C. Second and Third Claims: Conspiracy

Defendants maintain that no factual or legal support exists for the Second and Third Claims in the Complaint alleging conspiracy under 42 U.S.C. §§ 1985 and 1986 and at common law to violate Daniel's constitutional rights to due process and equal protection. Although Plaintiff does not specify the provision of Section 1985 under which she brings her claims, it appears that she brings her claim of deprivation of civil rights pursuant to Section 1985(3), which

provides in relevant part:

> If two or more persons in any State or territory conspire... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws... [, and] if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). To establish a conspiracy claim under Section 1985, Plaintiff must show that Defendants (1) engaged in a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons the equal protection of the laws, or the equal privileges and immunities under the laws; (3) acted in furtherance of the conspiracy; and (4) deprived such person or class of persons the exercise of any right or privilege of a citizen of the United States. N.Y. State Nat'l Org. for Women v. Terry, 886 F.2d 1339, 1358 (2d Cir. 1989), cert. denied, 495 U.S. 947 (1990). Because Section 1985(3) may not be construed as a "general federal tort law," a Plaintiff must also demonstrate "some racial, or perhaps otherwise class-based, invidiously discriminatory animus before the conspirators' action." Terry, 886 F.2d at 1358 (quoting Griffin v. Breckerinridge, 403 U.S. 88, 102-03 (1971)). Plaintiff's Section 1985 claim automatically fails because judgment has been entered for Defendants on Plaintiff's due process and equal protection claims. Without a constitutional violation, no Section 1985 claim for conspiracy to commit a constitutional violation can lie.

Plaintiff's claim that Defendants are liable for conspiracy at common law must fail for the same reason. To prevail on a Connecticut common law claim for conspiracy, a plaintiff must demonstrate: (1) a combination between two or more persons; (2) to do a criminal or unlawful act or a lawful act by criminal or unlawful means; and (3) an act done by one or more of the

conspirators pursuant to the scheme and in furtherance of the object; (4) which act results in damage to the plaintiff. <u>Harp v. King</u>, 266 Conn. 747, 779 (2003). However, no independent claim for civil conspiracy exists; "to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." <u>Id.</u> at 779 n.37. Here, Plaintiff's common law claim is joined in the Second Claim of the Complaint with her Section 1985 claim of a conspiracy to deprive Daniel of his constitutional rights. (Compl. ¶¶ 53-54.) Because Plaintiff's Section 1985 claim has failed, her common law claim necessarily fails as well.

Absent viable conspiracy claims, Plaintiff's claim pursuant to 42 U.S.C. § 1986 necessarily fails. Section 1986 provides a cause of action against anyone who, "having knowledge of any of the wrongs conspired to be done and mentioned in Section 1985 are about to be committed and having power to prevent or aid, neglects to do so." <u>Mian v. Donaldson, Lufkin & Jenrett Secs. Corp.</u>, 7 F.3d 1085, 1088 (2d Cir. 1993) (<u>quoting</u> <u>Katz v. Morgenthau</u>, 709 F. Supp. 1219, 1236 (S.D.N.Y.), <u>aff'd in part and rev'd in part on other grounds</u>, 892 F.2d 20 (2d Cir. 1989). As a result, "a Section 1986 must be predicated upon a valid Section 1985 claim." <u>Mian</u>, 7 F.3d at 1088; <u>see also</u> <u>Bond v. Middletown</u>, 389 F. Supp. 2d 319, 340 (D. Conn. 2005). Because Plaintiff does not have a valid Section 1985 claim, her Section 1986 claim must fail. Defendants' motion for summary judgment with regard to Plaintiff's Third Claim is granted.

### D.    Defendant Ruocco's Supervisory Liability

Defendants also move for summary judgment for all claims against Defendant Elizabeth Ruocco on the grounds that no supervisory liability can be established on her behalf. Supervisory liability does not attach under Section 1983 on the basis of respondeat superior or

other theories of vicarious liability, Monell, 436. U.S. at 691; Johnson v. Glick, 481 F.2d 1028, 1034 (2d Cir. 1973), and it may not be premised upon mere negligence. Moffitt v. Town of Brookfield, 950 F.2d 880, 886 n.5 (2d Cir. 1991) (citing Daniels v. Williams, 474 U.S. 327 (1986)). Rather, in order to be liable under Section 1983, a defendant who had a supervisory role must have been personally involved in the unlawful actions. See Al-Jundi v. Estate of Rockefeller, 885 F.2d 1060, 1065-66 (2d Cir. 1989); Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994). "Personal involvement" may be shown by evidence of: (1) direct participation in the wrongdoing; (2) failure to remedy an ongoing wrongdoing after notification of such violation; (3) institution or continuance of an unconstitutional policy or custom; or (4) gross negligence in the management of subordinates responsible for the constitutional deprivation. Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986). Because Plaintiff's claim alleging a violation of the IDEA is her only Section 1983 claim to survive summary judgment, Defendant Ruocco's supervisory liability turns on whether she failed to remedy a denial of Daniel's FAPE after notification of a problem or whether she was grossly negligent in managing the teachers and administrators responsible for the IDEA violations.

Questions of fact preclude summary judgment on the issue of whether Ruocco either directly participated in a violation of Daniel's rights or that she failed to remedy an ongoing wrongdoing committed by other Defendants after notification of such violation. In her affidavit, Defendant Ruocco avers that she had no personal involvement with Daniel or Plaintiff Scruggs and that she had no direct responsibility for or participation in the supervision of Defendants Iacobelli or Mule. (Ruocco Aff. ¶¶ 4-8.) Plaintiff contends, however, that other facts in the record suggest that Ruocco's position is disingenuous. The Court agrees that facts in the record

preclude a finding as a matter of law that Ruocco had no supervisory liability over the underlying actions alleged in this matter.  Even if Ruocco was not personally involved in handling Daniel's issues at school, a question of fact remains as to whether Ruocco was notified of any violations of Daniel's rights and whether she failed to remedy an ongoing wrongdoing.  In the fall of 2001, the school district filed a truancy complaint in the Superior Court and a Family with Service Needs Petition against Scruggs (Defs.' Local R. 56(a) ¶ 38); a factfinder might conclude that Ruocco would have had knowledge of the Board's involvement in any pending state court litigation and therefore would have learned about Daniel's problems at school.

Plaintiff also contends that Ruocco was the designated Section 504 Coordinator for the school district, and in that capacity Ruocco disseminated a notice, as required by federal law, see 34 C.F.R. § 104.7, listing the Superintendent of Schools as the sole individual responsible for monitoring the entire school system to ensure that the Board is in compliance with Section 504. Although Defendants are entitled to summary judgment on Plaintiff's claims of a Section 504 violation, facts in the record suggest the possibility that a question arose in Daniel's case as to the proper implementation of Section 504 policies, a question which should have been raised to Ruocco.  It is reasonable to infer the possibility that notice of problems implementing the Section 504 policies also should have alerted Ruocco to problems in Daniel's case with IDEA compliance, thereby triggering Ruocco's responsibility to remedy the alleged violation, or the possibility that she failed to consider the possibility of an IDEA violation and thereby negligently mismanaged her subordinates in their treatment of Daniel's needs.  Drawing all reasonable inferences in favor of the nonmoving party and based on the totality of evidence presented, questions of fact remain regarding Ruocco's supervisory liability conduct in this case.

Accordingly, Defendants' motion for summary judgment on all claims against Ruocco on this basis is denied.

### E.    Qualified Immunity

Defendants move for summary judgment against the individual defendants on the ground that they are immune from liability under the doctrine of qualified immunity.  Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).  As such, qualified immunity is appropriately raised and determined on summary judgment.  See Saucier v. Katz, 533 U.S. 194, 200-01 (2001) ("Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive.").  Government officials engaged in the performance of discretionary functions are immune from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 45 U.S. 800, 818 (1982).

A government official sued in his or her individual capacity is entitled to qualified immunity if the "plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred" or if "the defendant's action was objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken."  Rapkin v. Rocque, 228 F. Supp. 2d 142, 145-46 (D. Conn. 2002) (citing Munafo v. Metro. Transp. Auth., 285 F.3d 201, 210 (2d Cir. 2002)); accord Saucier, 533 U.S. at 201; Anderson v. Creighton, 483 U.S. 635 (1987).  In ruling upon the qualified immunity issue, a Court must consider the threshold question: Taken in the light most favorable to the party asserting the

injury, do the facts alleged show the Defendants' conduct violated a federal or constitutional right? Saucier, 533 U.S. at 201 (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). For the reasons discussed above, taken in the light most favorable to Plaintiff, the facts alleged show that Defendants violated Daniel's rights under federal law.

The next question for the Court is whether the right was clearly established. Saucier, 533 U.S. at 201. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id.; see also Wilson v. Layne, 526 U.S. 603, 615 (1999) ("[A]s we explained in Anderson, the right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."). "Summary judgment should not be granted on the basis of a qualified immunity defense premised on an assertion of objective reasonableness unless the defendant shows that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." Hussain v. Springer, --- F.3d ----, 2007 WL 2020028, at *17 (2d Cir. July 13, 2007) (quoting O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003) (internal quotation marks omitted)).

The Second Circuit has explained that, in determining whether a right is clearly established for qualified immunity purposes, "the right ... need not be limited to the specific factual situation in which that right was articulated." Jones v. Parmley, 465 F.3d 46, 56 (2d Cir. 2006). This is because "the Supreme Court has declined to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, and has, instead, chosen a standard that excludes such immunity if in the light of pre-existing law the

unlawfulness [is] apparent." Id. (citing Back v. Hastings on Hudson Union Free Sch. Dist., 365

F.3d 107, 129 (2d Cir. 2004)) (internal citations and quotation marks omitted)).  It has been

clearly established that the IDEA provides certain statutory rights to public school students with

disabilities, and the requirements of this statutory scheme should be familiar to school teachers

and administrators who work with disabled students.  On the facts alleged in this case, a

reasonable jury could find that the individual Defendants violated Daniel's procedural rights

under the IDEA, such as his right to a triennial evaluation and written prior notice of a proposed

change to his IEP, or violated his substantive right to a FAPE.  "Although there may not have

been any precedents with precisely analogous facts" prior to the instant case, Back, 365 F.3d at

130 (internal citations omitted), given school personnel's general familiarity with their

obligations under the IDEA, the Court cannot conclude that no reasonable jury would find

Defendants' alleged treatment of Daniel to be objectively reasonable in light of the IDEA.

Accordingly, the Defendants are not entitled to qualified immunity at this time.

   **F.**  **Negligence Claim and Governmental Immunity**

  Defendants also move for summary judgment on Plaintiff's state law negligence claim, in

which she alleges that Defendants owed Daniel a duty to protect him and prevent intentional

harm, provide him with a safe and productive learning environment, and supervise students at

WMS to prevent the alleged acts which harmed Daniel (Compl. ¶¶ 64-66), and that Defendants

breached this duty "by failing adequately to supervise the students at Washington Middle School

or to take steps to prevent the acts and offenses described above."  (Id. at ¶ 67.)  Defendants

contend that Plaintiff's claim is barred by the doctrine of governmental immunity.

Section 52-557n of the Connecticut General Statutes provides that "a political subdivision of the state shall not be liable for damages to person or property caused by... negligent acts or omissions which require the exercise of judgment or discretion as an official function of the authority expressly or impliedly granted by law." CONN. GEN. STAT. § 52-557n(a)(2). See also Violano v. Fernandez, 280 Conn. 310, 318, 907 A.2d 1188, 1193 (2006) ("[g]enerally, a municipal employee is liable for the misperformance of ministerial acts, but has a qualified immunity in the performance of governmental acts.... Governmental acts are performed wholly for the direct benefit of the public and are supervisory or discretionary in nature."); Martel v. Metro. Dist. Comm'n, 275 Conn. 38, 48-49 (2005). Defendants argue that, as teachers and educators performing discretionary public duties, they are immune from liability. Although the conduct of teachers and educators in supervising students is a discretionary public duty, three exceptions exist, to the general rule of qualified immunity for municipal employees performing discretionary acts: "first, where the circumstances make it apparent to the public officer that his or her failure to act would be likely to subject an identifiable person to imminent harm ...[,] second, where a statute specifically provides for a cause of action against a municipality or municipal official for failure to enforce certain laws ...[,] and third, where the alleged acts involve malice, wantonness, or intent to injure, rather than negligence." Burns v. Bd. of Educ. of City of Stamford, 228 Conn. 640, 645 (1994) (internal citations omitted).

The only exception relevant to this case is the exception permitting a tort action in circumstances of perceptible harm to an identifiable person. The Connecticut Supreme Court has construed this exception "to apply not only to identifiable individuals but also to narrowly defined identified classes of foreseeable victims," id. (citing Sestito v. Groton, 178 Conn. 520,

42

527-28 (1979)), and has held that a school child is a member of a foreseeable class of victims to whom school administrators owe a special duty of care. Id., 228 Conn. at 645. To apply this exception to governmental immunity, the Court must determine whether the evidence presented is sufficient to establish that it was apparent to Defendants that their failure to provide adequate supervision would be likely to subject schoolchildren to imminent harm. See id., at 109; Colon v. City of New Haven, 60 Conn. App. 178, 185 (2000).

Connecticut courts have applied the "identifiable person-imminent harm exception" in cases involving injuries to schoolchildren where the dangerous condition was sufficiently limited both in duration and in geography. See Purzycki v. Fairfield, 244 Conn. 101 (1998); Burns v. Bd. of Educ., 228 Conn. at 645; Colon v. City of New Haven, 60 Conn. App. at 178; Doe v. Bd. of Educ. of City of New Haven, 76 Conn. App. 296, 303-04 (2003). In Burns, for example, the plaintiff schoolchild slipped and fell on an icy courtyard in a main walkway of the school campus, and the court concluded that the danger was limited to the duration of the temporary icy condition located in a particularly 'treacherous' area of the campus. Burns, 228 Conn. at 650. Similarly, in Purzycki, the court applied the identifiable person-imminent harm exception where the plaintiff schoolchild was injured on one occasion when another student tripped him in an unmonitored school hallway during the one-half hour interval when second grade students crossed an unsupervised hallway on their way from the lunchroom to recess. Purzycki, 244 Conn. at 104, 110. In Doe, however, the exception did not apply where plaintiff had alleged that the school was negligent by failing to implement sufficient safety precautions, thereby creating a situation in which she was sexually assaulted by three classmates in an unsupervised vacant classroom. Doe, 76 Conn. App. at 304-05. Because the harm in Doe could potentially have

occurred at any time that students traveled to unsupervised areas of the school during the duration of school hours, the court concluded that it would not have been apparent to the defendant that its discretionary policy decisions subjected students to imminent harm.  Id.

In this case, Plaintiff, like the plaintiff in Doe, asserts that because the alleged bullying and harassment to which Daniel was subjected by his classmates occurred during the school day on the premises of his middle school, the alleged danger was of temporary duration and limited geographical scope.  However, the dangerous condition must be confined to a specific limited period such as the duration of the icy condition in Burns or the half-hour period in Purzycki, rather than extended to all hours of the school day.  See Doe, 76 Conn. App. at 305 n.7. Furthermore, the geographical scope of the alleged bullying and harassment must be limited to a particular site on school property which presents a particular imminent harm, rather than extended throughout the school premises.  Without these limitations, the Court cannot conclude that the potential for harm to Daniel was significant and foreseeable within the meaning of a state law claim for negligence, even if, as Plaintiff attests, the Defendants were well aware of the allegedly constant bullying to which Daniel was subjected in 2000 and 2001.  Accordingly, Plaintiff has not established that she is entitled to the identifiable person-imminent harm exception to governmental immunity for tort claims.  Defendants are therefore entitled to qualified immunity on Plaintiff's negligence claim, and summary judgment is entered for Defendants on the fifth count of Plaintiff's Complaint.

IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 74] is **granted in part** and **denied in part.**   Summary judgment is granted for Defendants on Counts

Two, Three, Four, and Five of Plaintiff's Complaint.

SO ORDERED.

Dated at New Haven, Connecticut, this __7th__ day of August, 2007.

_____/s/_____
Peter C. Dorsey, U.S. District Judge
United States District Court